307 F.3d 1045
 RK VENTURES, INC., dba Celebrity Italian Kitchen dba The Mezzanine; Keith Olson; Ronald Santi, individually and as officers, directors and shareholders, Plaintiffs-Appellants,
v.
CITY OF SEATTLE; Mark Sidran; Joe Parks, Sgt.; Christine Robbin, Officer, (nee Batdorf); Tina Bueche, Defendants-Appellees.
 No. 99-35128.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 8, 2000.
 Withdrawn November 16, 2001.
 Resubmitted June 17, 2002.
 Filed October 7, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Bradley H. Bagshaw, Helsell Fetterman LLP, Seattle, Washington and David R. Osgood, Seattle, WA, for plaintiffs-appellants.
 Robert L. Christie, Johnson Martens Christie Andrews & Skinner, P.S., Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief Judge, Presiding. D.C. No. CV-97-01795-R.
 Before: B. FLETCHER and FISHER, Circuit Judges, and SCHWARZER, District Judge.*
 FISHER, Circuit Judge.
 
 
 1
 Appellants are the owners of a former Seattle nightclub known at one time as the Celebrity. Beginning in about 1990, appellants allege, the City of Seattle ("the City") pursued a campaign designed to stop downtown Seattle nightclubs from playing rap and hip-hop music because the music attracted African Americans and crime to the area. They allege that the City's efforts, while ostensibly directed at crime control, in fact were racially motivated, in violation of the equal protection rights of appellants and their former patrons. They further allege the City's efforts violated their First Amendment rights by impermissibly discriminating against a particular musical viewpoint. At the center of their claims stands a public nuisance abatement ordinance enacted by the City in 1992. Appellants contend that the City enforced the ordinance against them because of their choice of music and the race of their clientele, in violation of the Equal Protection Clause and First Amendment, eventually forcing appellants to sell the club at a "fire sale" price. They also contend that the ordinance is unconstitutionally vague and overly broad, in violation of the Due Process Clause of the Fourteenth Amendment. Appellants have brought federal law claims under 42 U.S.C. §§ 1983, 1985 and 1986 and have asserted a variety of state law claims.
 
 
 2
 The district court granted summary judgment against appellants as to their federal law claims and declined to exercise jurisdiction over their state law claims. The court concluded that only one allegedly discriminatory act occurred within the three-year statute of limitations period and determined that this single act could not, as a matter of law, constitute a constitutional violation. We disagree. We hold that the district court correctly ruled that acts falling outside of the limitations period are time barred. In light of National Railroad Passenger Corp. v. Morgan, ___ U.S. ___, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), we reject appellants' attempts to render older conduct on the part of the City actionable under the continuing violations doctrine. We hold that appellants have alleged one discrete act occurring within the limitations period — the decision by the City to withdraw its offer to settle its abatement action against appellants. In determining whether the City's conduct falling within the limitations period raised a triable issue, the district court erred in analyzing such conduct without considering any of the background evidence in the record. The court should have considered the City's time-barred acts against appellants, as well as the City's similar acts against other clubs, as evidence that the conduct falling within the limitations period had an unconstitutional purpose. Because appellants have created a genuine issue of material fact as to whether the City discriminated on account of viewpoint or race, we reverse. We hold, however, that appellants do not have standing to assert claims on behalf of their former patrons or to obtain declaratory relief and that appellants' claims under § 1986 are time barred. Finally, we remand the question of appellants' standing under § 1985 for factual development.
 
 FACTS AND PROCEDURAL BACKGROUND[1]
 
 3
 Ronald Santi and Keith Olson are the owners of RK Ventures, Inc., through which they owned the Celebrity Italian Kitchen ("the Celebrity"), a restaurant and nightclub that operated in downtown Seattle's Pioneer Square area from 1985 to 1994. On certain nights of the week, the Celebrity featured rap and hip-hop music, which attracted a predominantly African-American audience.[2]
 
 I. Pre-Limitations Period Events
 
 4
 In September 1992, the City enacted a public nuisance abatement ordinance ("the Ordinance") ostensibly aimed at addressing "the pervasive problems of increased violence, noise, public drunkenness, drug-trafficking and other illegal activity." The Ordinance allows the City to institute abatement proceedings against property owners and businesses that it determines constitute a public nuisance. It also establishes a voluntary procedure through which a business may cooperate with the Seattle Police Department to rectify any nuisance problems the business causes. In addition, should the City decide the problems remain uncorrected, the Ordinance provides that the City may commence a formal abatement action, which includes a hearing before an independent examiner, whose decision is appealable to the superior court.
 
 
 5
 Appellants allege that a set of handwritten notes taken by Seattle City Councilwoman Margaret Pageler contemporaneous with the Ordinance's enactment explain the City's purpose in passing the Ordinance. In addressing the "after-hours problems" at clubs, Pageler wrote, "You can control the kind of people that come in — By music you play" and "By people you let in." She wrote, "Hip-hop nights attract a boom-box crowd," and "Club patrons are not residents of the area." "Black gangs hanging out are the problem," she noted. She also identified "Pinpoint abatement" as a solution to the problems and noted that the "After hours club issue is a small part of the problem of safety in neighborhood." Appellants also point to the statements of Seattle's then-city attorney, Mark Sidran, who told a local newspaper:
 
 
 6
 There is a relationship between a [music] format that draws young African-American males and gunfire and violence on the streets. This music format in late-night, after-hours clubs is associated with criminal acts inside and outside the club. There are other clubs that have this music format where they've had this problem — violence, shootings, disorderly behavior. The bottom line is, race is not a refuge for criminal behavior. We have not said "change the music format." But we have pointed out the obvious problems with it.... The fact is the clientele that these clubs draw engage in this type of behavior. They either have to control their clientele or change it.
 
 
 7
 Appellants contend the enactment of the Ordinance and its subsequent enforcement against them were part of a City campaign waged against clubs playing rap music and attracting young African-American males to downtown Seattle that started as early as 1990. In January 1990, an internal Seattle Police Department memorandum identified problems of "increased assaults, gang activity, and narcotics activity" located in the parking lot kitty-corner to the Hollywood Underground nightclub. Because the nightclub was open late "and has a Rap music format on weekends, it has become the nightclub of choice for gang members and rowdy youths." The memorandum identified several "non-traditional" and "traditional" "solutions" to the problems, including voluntary early closure, voluntary change in the music format to "draw[ ] a more varied crowd," working with the Liquor Board to suspend late night dance and music licenses, increasing the presence of the police and, if "the owner proves to be less than helpful, the Liquor Board and the Fire and Health Departments will be utilized" to pursue a code violations strategy. Another "nontraditional" method identified by the police was to "[c]oordinate and organize community group input about the situation to the outside agencies, i.e., Liquor Control Board, City Department of Licensing and Consumer Affairs."
 
 
 8
 After the Hollywood Underground closed, an establishment named Jersey's All-American Sports Bar began playing rap music on weekend nights. In early 1992, two Seattle police officers approached the owner of the club and told him that his business would be closed through drug abatement, eviction, revocation of its liquor license or revocation of its health permit if he did not change his clientele, stating that his African-American patrons belonged in the Tacoma or Seattle Central District, but not in downtown Seattle. The City convinced the Liquor Control Board to alter the All-American's license, forcing the club to change its music format.
 
 
 9
 In mid-1992, the City turned its attention on the Belltown club, which had begun using a "Rhythm and Blues" music format on weekend nights. "The Belltown problem[then] apparently moved down to Celebritys [sic] on Sunday nights." The Celebrity had begun using a rap music format on Sunday nights. Citing "a dramatic negative impact on neighboring community and police resources" and hundreds of 911 calls involving the club, the City in April 1993 moved to have the club's liquor license revoked. The City also made frequent fire inspections of the club, videotaped the club, provided off-duty police officers to other clubs but denied such assistance to Celebrity, made undercover drug buys at the club and performed criminal background checks on the club's owners.
 
 
 10
 The City also targeted another establishment, Pier 70, that was "trying to attract the [Sunday night] customers from Celebrities [sic]." A 1992 Seattle Police Department memorandum stated that police:
 
 
 11
 want to set up a meeting with the owner and management of Pier 70, explain our laundry list of recommendations to control a bar scene, the new public nuisance law, liquor license conditions, problems and impact on Jerseys, Belltown, Oz and now celebrities [sic]. Start out nice and partnership, we want you to do business but if you have behavior problems, crimes, comm. complaints 911 calls that we will be building our files and may take action through the many avenues we now have.
 
 
 12
 Abatement proceedings were commenced against Pier 70, but were halted because "they pulled the plug on their hip-hop."
 
 
 13
 Then, in December 1993, the Seattle city attorney and the police chief jointly sent appellants a letter detailing several police reports and incidents of criminal activity in and around the Celebrity. The letter stated that the police chief had determined the Celebrity to be a public nuisance. Appellants and the City opened discussions that ultimately culminated in January 1994 with the execution of a "Voluntary Correction Agreement," or "VCA," as provided for by the Ordinance. Under the terms of the VCA, appellants agreed to make specific changes at the Celebrity.
 
 
 14
 The City monitored the nightclub's performance under the VCA for several months, but decided to institute formal abatement proceedings in October 1994. On October 18, 1994, the City police chief sent a letter to appellants and their counsel giving a formal Notice of Abatement of Public Nuisance. On October 27, 1994, the City Examiner's Office sent a letter to the City and appellants advising them of the commencement date and format of the administrative hearing. Despite the City's decision to institute abatement proceedings, the club continued its efforts to ward off the enforcement action. It changed its name to the "Mezzanine," and also changed its music format to one "that would attract a mainly Caucasian audience," hoping this would prompt the City to stop enforcement of the Ordinance.[3]
 
 II. Limitations Period Events
 
 15
 The City pressed on. The formal abatement hearing against RK Ventures began on November 14, 1994. The City presented evidence against appellants for three days. By this time, appellants claim, they had decided they could no longer afford to fight; they entered into negotiations to sell their business to the owners of the Fenix, a neighboring nightclub that featured music appealing to a predominantly white audience. A condition of the deal between appellants and the Fenix, however, was that the City drop its abatement action.
 
 
 16
 To that end, appellants and the City began negotiations over the terms under which the City would be willing to end the abatement proceedings. On the morning of December 5, 1994, the City gave appellants a settlement offer, listing the terms under which it would be willing to terminate the nuisance abatement action. Later that day, however, upon learning that appellants still occasionally played rap music and planned to do so at a final closing party on New Year's Eve, the City formally withdrew its offer, stating:
 
 
 17
 It has just come to our attention that your clients, Ron Santi and Keith Olson have returned to their old music format at the Mezzanine. Our understanding is that the deejay is back and was playing hip hop music this past weekend. In addition, we have heard that Mssrs. Santi and Olson intend on having a "going away" night on New Year's eve with that same music format.
 
 
 18
 In light of this development, the offer faxed to you this morning is revoked.
 
 
 19
 Soon thereafter, further negotiations took place and, on December 13, the City made another settlement offer of the terms under which it would be willing to terminate the nuisance abatement action. By late December 1994, both parties agreed the proceeding could be dismissed as moot, due to the sale of the club to the owners of the Fenix. No order of abatement was ever issued by the hearing examiner.
 
 
 20
 On November 14, 1997, exactly three years after the commencement of abatement hearing against RK Ventures, appellants filed this lawsuit, alleging that the City applied the Ordinance to their establishment because their choice of music attracted a predominately black audience. They complained under 42 U.S.C. § 1983 that the City's nuisance abatement Ordinance is unconstitutionally overbroad and vague and, even if constitutional on its face, that the City enforced the Ordinance in a discriminatory fashion, in violation of the Fourteenth Amendment.[4] They also complained that defendants engaged in a civil conspiracy to violate civil rights in violation of 42 U.S.C. §§ 1983, 1985 and 1986.[5] Appellants also contended that the City's enforcement of the Ordinance was aimed directly at preventing them from playing the music of their choice — rap and hip-hop — in violation of their free speech rights under the First Amendment. Appellants sought damages and a declaration that the Ordinance was void.
 
 
 21
 In response to the City's motion for summary judgment, the district court determined that nearly all the events appellants complained about occurred outside of the three-year statute of limitations period applicable to civil rights actions in the state of Washington. The court found that the only event within the limitations period was the enforcement hearing itself, which standing alone did not support "even an inference of discriminatory activity." The court granted summary judgment to the City on all of appellants' federal claims, and declined to exercise supplemental jurisdiction over the remaining state claims. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). We have jurisdiction under 28 U.S.C. § 1291.
 
 DISCUSSION
 I. Standing
 
 22
 A. Claims on Behalf of the Celebrity's Former Patrons
 
 
 23
 As an initial matter, the City argues appellants' Fourteenth Amendment equal protection claims on behalf of its former patrons should be dismissed for lack of standing. Appellants maintain that they have standing to assert the equal protection rights of their former patrons, citing the line of Supreme Court cases allowing third-party standing. See, e.g., Craig v. Boren, 429 U.S. 190, 194-97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that vendor had standing to assert rights of male patrons between ages of 18 and 21); Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (holding that physicians had standing to challenge abortion statute). We agree that appellants lack standing to assert their former patrons' equal protection claims.
 
 
 24
 Appellants' claims for money damages do not establish third-party standing. Our decision in Conti v. City of Fremont, 919 F.2d 1385 (9th Cir.1990), is directly on point. There, the owner of a roller disco challenged the City of Fremont's refusal to amend a zoning conditional use permit, which made it impossible for him to serve patrons ages 18 through 20. Conti argued the city's actions were unconstitutional and violated the First and Fourteenth Amendment rights of his patrons, most of whom were racial minorities. We held that, even if the age restriction was found unconstitutional and damages were paid to Conti, this would not redress his former patrons' injuries, so Conti lacked standing to raise claims on their behalf. Id. at 1387-88.
 
 
 25
 Appellants' claim for declaratory relief also cannot establish their third-party standing. Because appellants' have sold their business and do not intend to revive that business, they no longer have the requisite "close relation to the third party" to establish third-party standing. Wasson v. Sonoma County Junior Coll., 203 F.3d 659, 663 (9th Cir.), cert. denied, 531 U.S. 927, 121 S.Ct. 305, 148 L.Ed.2d 245 (2000). Cases bestowing third-party standing on vendors usually emphasize the vendor's close relation to the third party. "[T]he relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." Singleton v. Wulff, 428 U.S. 106, 115, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Here, however, appellants are no longer operating, or intending to operate, a nightclub in Seattle. They no longer possess a close relationship with their former patrons. Although they may have an interest in seeing the nuisance abatement Ordinance invalidated, their stake in that outcome is not so aligned with their former patrons as to convince us that they would be "fully, or very nearly, as effective a proponent" as their former patrons themselves. Id. Because we are not persuaded that appellants would be "a motivated, effective advocate" for the declaratory relief sought, Powers v. Ohio, 499 U.S. 400, 414, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), we hold that appellants lack standing to assert the rights of their former patrons.
 
 B. Standing in Appellants' Own Right
 
 26
 We nonetheless hold that appellants have standing under § 1983 to pursue their First Amendment and equal protection claims in their own right. Appellants contend the City's efforts were designed to prevent them from playing the music of their choice; their free expression claims do not rest on the right of their patrons to listen to rap or hip hop music. Appellants thus have standing under the First Amendment.
 
 
 27
 Turning to appellants' equal protection claims, we have said that "[a] white plaintiff generally does not have standing under Section 1983 solely for the purpose of vindicating the rights of minorities who have suffered from racial discrimination." Maynard v. City of San Jose, 37 F.3d 1396, 1402 (9th Cir.1994). But plaintiffs who are not members of the protected class have standing to challenge racially discriminatory conduct in their own right when they are the direct target of the discrimination. See, e.g., Estate of Amos v. City of Page, 257 F.3d 1086, 1093-94 (9th Cir.2001); Maynard, 37 F.3d at 1403. We find no bar to standing under the Equal Protection Clause where an individual alleges a personal injury stemming from his or her association with members of a protected class. See Maynard, 37 F.3d at 1403 (holding that white plaintiff had standing where he suffered from illegal retaliation because he assisted a black person). Moreover, "[a] person required by the government to discriminate by [race] against others has standing to challenge the validity of the requirement, even though the government does not discriminate against him." Monterey Mech. Co. v. Wilson, 125 F.3d 702, 707 (9th Cir.1997); accord Columbia Basin Apartment Ass'n v. City of Pasco, 268 F.3d 791, 798 (9th Cir.2001). A "law compelling persons to discriminate against other persons because of race" is a "palpable violation of the Fourteenth Amendment." Peterson v. City of Greenville, 373 U.S. 244, 248, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).
 
 
 28
 Here, appellants were the direct targets of the City's alleged racial discrimination due to their association with their African-American patrons. The City's efforts were aimed at forcing appellants to discriminate against members of the protected class. We hold, therefore, that appellants have standing under § 1983 to assert their own equal protection claims.
 
 
 29
 Appellants may lack standing under § 1985, however. To bring a cause of action successfully under § 1985(3), a plaintiff must demonstrate a deprivation of a right motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir.1992) (internal quotation marks omitted). Particularly relevant here, the plaintiff must be a member of the class discriminated against. McCalden v. Cal. Library Ass'n, 955 F.2d 1214, 1223 (9th Cir.1990); Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 720-21 (9th Cir.1981); accord Voigt v. Savell, 70 F.3d 1552, 1564 (9th Cir.1995). Although appellants may satisfy the first requirement, the second requirement casts doubt on their standing.
 
 
 30
 Because we have raised this standing issue sua sponte and the record is not adequately developed on whether the § 1985 standing requirements are satisfied, we instruct the district court to address this threshold question on remand. The standing requirements may be satisfied if appellants are African American. Alternatively, appellants may satisfy the standing requirements if they can show that they are members of a class that the government has determined "require[s] and warrant[s] special federal assistance in protecting their civil rights." Sever, 978 F.2d at 1536 (internal quotation marks omitted); see, e.g., Maynard, 37 F.3d at 1403 (holding that white employee had standing under § 1985 to assert that he was unlawfully retaliated against for assisting black person where Congress, through enactment of Title VII, had "grant[ed] special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices").[6]
 
 C. Declaratory Relief
 
 31
 We also hold that appellants do not have standing to seek declaratory relief. We raise this standing issue sua sponte, as the law requires. Biggs v. Best, Best & Krieger, 189 F.3d 989, 998 n. 7 (9th Cir.1999). Appellants lack standing to pursue declaratory relief because the Celebrity is no longer in business and is no longer subject to the nuisance abatement Ordinance. See Harris v. Itzhaki, 183 F.3d 1043, 1050 (9th Cir.1999) (holding that tenant subjected to racial discrimination by landlord did not have standing for injunctive and declaratory relief because she moved from building); Cornett v. Donovan, 51 F.3d 894, 897 (9th Cir.1995) (holding that former patient who was no longer institutionalized at state facility for mentally ill lacked standing to pursue declaratory relief in suit asserting facility denied patients right of access to courts); Blair v. Shanahan, 38 F.3d 1514, 1519 (9th Cir.1994) (holding that plaintiff lacked standing to request declaratory relief against antipanhandling statute because it was unlikely that he would ever again desire to panhandle). Appellants do not assert that they would reopen their club if the Ordinance were struck down. See Clark v. City of Lakewood, 259 F.3d 996, 1007-08 (9th Cir.2001) (holding that owner had standing to challenge adult cabaret ordinance that forced him to close business where plaintiff's "prospect of reopening was realistic and credible" if he obtained injunctive and declaratory relief).
 
 
 32
 D. Claims on Behalf of the Corporation and on Behalf of Santi and Olson as Individuals
 
 
 33
 The City also argues appellants Santi and Olson do not have standing because, as shareholders, they cannot bring a § 1983 civil rights action on behalf of the corporation. In general, shareholders lack standing to assert an individual § 1983 claim based on harm to the corporation in which they own shares. See Erlich v. Glasner, 418 F.2d 226, 228 (9th Cir.1969). "[I]njury to the corporation is not cognizable as injury to the shareholders, for purposes of the standing requirements." Shell Petroleum, N.V. v. Graves, 570 F.Supp. 58, 63 (N.D.Cal.), aff'd, 709 F.2d 593 (9th Cir.1983).
 
 
 34
 A shareholder does have standing, however, when he or she has been "injured directly and independently from the corporation." Shell Petroleum, 709 F.2d at 595. The same conduct may result in injury to both the corporation and the individual shareholders. See Gomez v. Alexian Bros. Hosp., 698 F.2d 1019, 1021 (9th Cir.1983) (per curiam) (holding that individual plaintiff had standing where he suffered injuries that were personal to himself and distinct from any injuries suffered by the corporation). In Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310 (9th Cir.1989), plaintiffs were the principal owners and shareholders of a corporation. They filed suit on behalf of the corporation and on behalf of themselves individually, alleging personal injuries for a violation of individual free speech rights and for mental and emotional distress. Id. at 1318. Because the complaint alleged violations of the rights of both the corporation and the individual owners, we held that plaintiffs had standing to bring their civil rights action. Id. at 1318-19.
 
 
 35
 Just as in Soranno's Gasco, Santi and Olson are the principal owners and shareholders of the corporation. In addition to asking for compensation for injury to RK Ventures, they also allege personal injury. Their complaint seeks damages for themselves, as individuals, for intentional infliction of emotional distress and for defamation. Also, they allege violations of their First and Fourteenth Amendment rights as individuals. Accordingly, they have standing to assert a civil rights claim.[7]
 
 II. Statutes of Limitations
 
 36
 We next address the question of summary judgment. We first determine what conduct on the part of the City is actionable under the applicable statutes of limitations. We then determine whether the appellants have raised triable issues respecting whether any of that conduct amounts to one or more constitutional violations.
 
 
 37
 The statute of limitations applicable to a § 1986 claim is one year. 42 U.S.C. § 1986; Donoghue v. Orange County, 848 F.2d 926, 929-30 (9th Cir.1987). No act of which appellants complain occurred within one year of the filing of the complaint. Accordingly, appellants' § 1986 claim is time barred.
 
 
 38
 The statute of limitations applicable to appellants' § 1983 and § 1985 claims is three years. See Joshua v. Newell, 871 F.2d 884, 886 (9th Cir.1989); Wash. Rev.Code § 4.16.080(2). To determine the timeliness of these claims, we must determine whether appellants have alleged "discrete acts" that would violate the Constitution that occurred within the limitations period. See Nat'l R.R. Passenger Corp. v. Morgan, ___ U.S. ___, ___, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002); Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam). Appellants contend that several actionable events occurred within the limitations period.
 
 
 39
 First, they contend that the City "commenced" the abatement hearing within the limitations period. The abatement hearing did begin on November 14, within the limitations period. But in determining when an act occurs for statute of limitations purposes, we look at when the "operative decision" occurred, Chardon, 454 U.S. at 8, 102 S.Ct. 28, and separate from the operative decisions those inevitable consequences that are not separately actionable. See Delaware State Coll. v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). We agree with the City that it "commenced" the abatement action on October 18, 1994, when the City police chief sent a letter to appellants and their counsel giving a formal Notice of Abatement of Public Nuisance, or on October 27, 1994, when the City Examiner's Office sent a letter to the City and appellants advising them of the commencement date and format of the administrative hearing. The City's decision to institute formal abatement hearings, and its notice to appellants of that decision, was the "operative decision" for the purposes of triggering the § 1983 statute of limitations. The actual beginning of the abatement hearing on November 14 was simply the effect of that decision and was not a separately unconstitutional act.
 
 
 40
 Second, appellants contend that the City's prosecution of the abatement action during the limitations period constitutes an actionable event. A statute of limitations under § 1983, however, begins to run when the cause of action accrues, which is when the plaintiffs know or have reason to know of the injury that is the basis of their action. Cabrera v. City of Huntington Park, 159 F.3d 374, 379 (9th Cir.1998). Appellants knew of the abatement action when they received notice of it in October 1994, outside the limitations period. Here again, the continued prosecution of the action within the limitations period was the inevitable consequence of the City's earlier initiation of the abatement proceeding.
 
 
 41
 As the Supreme Court established in Ricks and Chardon, the question is when the operative decision was made, not when the decision is carried out. In Ricks, the trustees of a college denied tenure to plaintiff, a professor, but they offered him a "terminal" contract to teach one additional year. 449 U.S. at 253, 101 S.Ct. 498. Ricks sued, claiming that his denial of tenure was discriminatory. The Court held that the limitations period commenced when the tenure decision was made and Ricks was notified, not when the employment ended. Id. at 258, 101 S.Ct. 498. Similarly, in Chardon, a § 1983 case, the Court concluded that the statute of limitations began to run when plaintiffs, several nontenured administrators of the Puerto Rico Department of Education, were given notice of termination, not on the date their employment terminated. 454 U.S. at 8, 102 S.Ct. 28. The Court explained that "[t]he fact of termination is not itself an illegal act." Id. "[T]he alleged illegal act was ... discrimination in the tenure decision." Id. As applied here, the fact of abatement (in the form of an order issued by a third-party hearing examiner) would not have constituted an actionable illegal act by the City.[8] Rather, the City's decision to institute the abatement action, allegedly tinged with racial and viewpoint discrimination, was the operative alleged illegal act.
 
 
 42
 We recognize the pitfalls attendant to our holding that appellants should have initiated their § 1983 action as soon as the City informed them of its decision to prosecute this abatement action. Notions of comity and commonsense suggest that a plaintiff should await the decision of the administrative or judicial process. The hearing examiner might have rendered this federal lawsuit unnecessary by ruling in appellants' favor. Our holding also does nothing to encourage nonlitigious resolution of such disputes. As we stated in Morales v. City of Los Angeles, 214 F.3d 1151, 1155 (9th Cir.2000), where we tolled the statute of limitations for an action alleging denial of access to the courts until completion of appellate proceedings, delaying the commencement of a federal lawsuit until the administrative process has taken its course "has the advantage of promoting judicial economy" and averting the filing of a lawsuit that might be rendered moot.[9] Justice Brennan articulated many of these concerns in his dissent in Chardon, where he stated:
 
 
 43
 The thrust of the Court's decision is to require a potential civil rights plaintiff to measure the time for filing his claim from the moment some form of injunctive relief first becomes available. The effect of this ruling will be to increase the number of unripe and anticipatory lawsuits in the federal courts — lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy.
 
 
 44
 454 U.S. at 9, 102 S.Ct. 28.
 
 
 45
 Similar reasoning had been advanced by the Third Circuit in Ricks. The Court of Appeals concluded that "policy reasons" dictated commencing the statute of limitations at the termination of employment, even though the discriminatory act in question — denial of tenure — occurred earlier. 449 U.S. at 259, 101 S.Ct. 498. As the Supreme Court explained, the appeals court "believed that the initial decision to terminate an employee sometimes might be reversed. The aggrieved employee therefore should not be expected to resort to litigation until termination actually has occurred." Id. at 255-56, 101 S.Ct. 498. But the Court rejected that reasoning, holding that the proper focus is on the occurrence of the discriminatory act, not the moment at which the operative decision becomes irrevocable. Id. at 259, 101 S.Ct. 498. Moreover, "[i]t should not be forgotten that time-limitations provisions themselves promoted important interests; `the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'" Id. at 259-60, 101 S.Ct. 498 (quoting Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 464, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)).[10]
 
 
 46
 Similarly, the Court in Ricks emphasized that our focus remains on the operative decision, even when further procedures might result in its reversal. To the extent, therefore, that the abatement action could be construed as an opportunity for appellants to forestall the City's decision to abate the Celebrity, we are not free to commence the statute of limitations at the completion of the abatement action rather than at its initiation. Following the denial of tenure in Ricks, the plaintiff immediately filed a grievance with the trustees' grievance committee. 449 U.S. at 252, 101 S.Ct. 498. During the pendency of the grievance, the college continued to plan for Ricks' termination. The trustees subsequently denied his grievance. Id. at 254, 101 S.Ct. 498. The EEOC, as amicus, argued that the statute of limitations should not have begun to run until the trustees notified Ricks that his grievance had been denied. Id. at 260, 101 S.Ct. 498. The Court disagreed. The pre-grievance decision was the "operative decision" because it was adequately final and represented the trustees' "official position." Id. at 261, 101 S.Ct. 498. The possibility that the trustees might reverse themselves as a result of the grievance, therefore, did not convert the denial of the grievance into the operative decision; nor did it establish a basis for tolling the statute of limitations. Id. at 260-61, 101 S.Ct. 498. As the Court explained:
 
 
 47
 [E]ntertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made.... As to the latter argument, we already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made.
 
 
 48
 Id. at 261, 101 S.Ct. 498 (citations and footnote omitted) (emphasis in original).[11]
 
 
 49
 Applying these principles here, we think it is clear that the City's decision to seek abatement was final and official once it initiated the abatement action. We therefore conclude that the City's prosecution of the abatement proceeding during the limitations period is not separately actionable.
 
 
 50
 Third, appellants contend that the withdrawal of the settlement offer on December 5 constitutes a discrete act falling within the limitations period. We agree. This was a separately actionable act on the part of the City. Rather than being the inevitable consequence of an earlier decision, this decision was the result of "independent consideration." Knox v. Davis, 260 F.3d 1009, 1014 (9th Cir.2001). Appellants have, therefore, asserted at least one allegedly unconstitutional discrete act falling within the limitations period.
 
 
 51
 Fourth, appellants allege that the "fire sale" of the Celebrity, which occurred during the limitations period, constitutes another discrete act falling within the limitations period. The sale of the Club, however, was not an "act" on the part of the City. Moreover, it was only an effect of the City's earlier decision to prosecute the abatement action. Of course, appellants may be able to obtain damages based on the allegedly below-market price they received for the Celebrity if, as they allege, unconstitutional discrete acts falling within the limitations period caused appellants to sell the business at a loss.
 
 
 52
 Finally, appellants contend that acts occurring prior to the limitations period are actionable under the continuing violation doctrine.[12] We disagree. As the Supreme Court recently clarified, the statute of limitations runs separately from each discrete act. Morgan, 122 S.Ct. at 2072. Morgan overruled previous Ninth Circuit authority holding that, if a discriminatory act took place within the limitations period and that act was "related and similar to" acts that took place outside the limitations period, all the related acts — including the earlier acts — were actionable as part of a continuing violation. Anderson v. Reno, 190 F.3d 930, 936 (9th Cir.1999). Morgan held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 122 S.Ct. at 2072. Accordingly, appellants cannot establish liability for events occurring prior to the limitations period on a continuing violation theory.[13]
 
 
 53
 In sum, we conclude that appellants' claims are for the most part barred by the statute of limitations, with one exception. Appellants have alleged one discrete act—withdrawal of the settlement offer—that occurred during the limitations period.
 
 III. Triable Issues
 
 54
 Our next task is to determine whether appellants have created a triable issue of race or viewpoint discrimination.[14] In assessing whether acts occurring within the limitations period are unconstitutional, we may look to pre-limitations period events as evidence of an unconstitutional motive. See Anderson, 190 F.3d at 936 ("[E]ven if not actionable in and of themselves, untimely claims serve as relevant background evidence to put timely claims in context."); accord Morgan, 122 S.Ct. at 2072; United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In addition, the City's allegedly discriminatory treatment of other clubs playing rap and hip-hop music and catering to African American patrons may be relevant evidence of an unconstitutional purpose. Cf. Heyne v. Caruso, 69 F.3d 1475, 1480 (9th Cir.1995) (holding that evidence of sexual harassment of other female employees can be used to prove employer's motive or intent in discharging plaintiff). Thus, we do not assess in a vacuum whether the acts falling within the limitations period raise an inference of discrimination. We consider the evidence in its entirety.
 
 
 55
 Considering all of the evidence, we respectfully disagree with the district court's assessment that appellants' claims do not survive summary judgment. We conclude that appellants have created a triable issue of a constitutional violation under both the Equal Protection Clause and the First Amendment. With respect to the equal protection claim, appellants raise a genuine issue of dissimilar treatment by the City between their establishment and those catering to a white audience. In addition, appellants have put forth evidence indicating a possibly racially discriminatory purpose. Councilwoman Pageler's notes and the statements of former City Attorney Sidran constitute direct evidence of discrimination. Appellants also allege a course of conduct following adoption of the public nuisance abatement Ordinance by which the City and the Seattle police intimidated patrons, failed to respond to calls and render assistance on request, denied requests to hire off-duty police officers to provide security, threatened to shut down the club, encouraged local residents to complain, provided false and inflammatory information to the public, targeted plaintiffs for harassment ticketing, sought to have the club's liquor license revoked, demanded early closing hours, initiated an abatement proceeding and, ultimately, forced the sale of the Celebrity. The direct evidence and the pattern of harassment against appellants and other clubs catering to African Americans all raise a genuine issue as to whether the withdrawal of the settlement offer was racially motivated, in violation of the Equal Protection Clause.
 
 
 56
 Regarding the First Amendment claim, appellants have offered undisputed evidence that the withdrawal of the settlement offer depended on appellants' choice of music format. Appellants provide strong evidence that the City withdrew its December 5 settlement offer because it learned they were still playing rap music occasionally, and intended to do so at the closing party on New Year's Eve. They say the City agreed to continue postponing the abatement hearing — which was critical in order for appellants to pursue negotiations to sell the Celebrity to the owners of the Fenix — only after appellants agreed never to play rap music again. We have serious concerns if the City in fact conditioned its support of the continuance on, or linked its settlement offer to, such a content-based restriction. See Soranno's Gasco, 874 F.2d at 1314 ("It is clear that `[s]tate action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.'") (quoting Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir.1986)); cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid.") (internal citations omitted).
 
 IV. OVERBREADTH AND VAGUENESS
 
 57
 The district court dismissed all of appellants' federal claims, including their facial challenges to the Ordinance, as barred by the statute of limitations. Because the Ordinance was enforced against appellants within the limitations period, this was error. Accordingly, we reverse the district court's dismissal of these claims.
 
 CONCLUSION
 
 58
 Appellants allege an act by the City that, if true, indicates discriminatory treatment in violation of the First and Fourteenth Amendments. Although much of the City's alleged wrongful conduct occurred outside of the statute of limitations period, appellants allege a discrete act within the three-year period. Because we conclude appellants have offered sufficient evidence to withstand summary judgment on claims arising from conduct that occurred within the limitations period, we reverse and remand. We hold, however, that appellants have standing neither to assert the claims of their former patrons nor to seek declaratory relief.[15] The question of appellants' standing under § 1985 is remanded to the district court. Each party shall bear its own costs on appeal.
 
 
 59
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Because we are reviewing an order granting summary judgment to the City, we present the relevant facts in the light most favorable to appellants and accept their version of all disputed factsCripe v. City of San Jose, 261 F.3d 877, 881 n. 1 (9th Cir.2001).
 
 
 [2]
 "Hip-hop" is defined as "[a] youth subculture, originating amongst the Black and Hispanic populations of New York City, which comprises elements such as rap music ..." 2 John Simpson and Edmund Weiner, Oxford English Dictionary 146 (Additions Series 1983). "Rap" is defined as "[a] style of popular music (developed by New York Blacks in the 1970s) ...."Id. at 218.
 
 
 [3]
 Notwithstanding the name change, we refer to the club as the "Celebrity" throughout this opinion
 
 
 [4]
 Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 42 U.S.C. § 1983.
 
 
 [5]
 Section 1985 authorizes a remedy against state actors who have conspired to deprive an individual of his civil rightsCerrato v. San Francisco Cmty. Coll. Dist., 26 F.3d 968, 971 n. 6 (9th Cir.1994). Section 1986 authorizes a remedy against state actors who have negligently failed to prevent a conspiracy that would be actionable under § 1985. Id. at 971 n. 7.
 
 
 [6]
 A court may not decide a cause of action before resolving whether the court has Article III jurisdiction; standing cannot be assumedSee Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Here, however, we are not required to resolve appellants' standing under § 1985 before reaching the merits of this appeal. Because appellants have standing on their § 1983 claim, we have jurisdiction to consider the merits of this appeal.
 
 
 [7]
 The City also makes the conclusory assertion that RK Ventures, Inc., as a corporation, has no standing under § 1983. They offer no basis for that assertion, and case law is to the contrary. As the First Circuit has observed, "[c]orporations are persons whose rights are protected by 42 U.S.C. § 1983."Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 16 (1st Cir.1979). "They are also persons who, under the Fourteenth Amendment, have a constitutional right to the equal protection of the laws." Id. "That [plaintiff] is a corporation has no bearing on its standing to assert violations of the first and fourteenth amendments under 42 U.S.C. § 1983." Advocates for the Arts v. Thomson, 532 F.2d 792, 794 (1st Cir.1976); see also First Nat'l Bank v. Bellotti, 435 U.S. 765, 780 n. 15, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (recognizing that corporations are persons within the meaning of the Fourteenth Amendment). Cf. Cal. Diversified Promotions, Inc. v. Musick, 505 F.2d 278, 283 (9th Cir.1974) (holding that corporations can bring § 1983 actions to vindicate their due process rights).
 
 
 [8]
 Appellants have made no allegation against the City Examiner's Office
 
 
 [9]
 Tolling is not an issue in this case. Appellants have not contended that Washington law would have tolled the statute of limitations during the pendency of the abatement action, nor argued any other basis for tolling
 
 
 [10]
 Of course, a particular decision will not be the "operative decision" where it is not a final one. The statute runs from thefinal decision, not a tentative or preliminary one. See McCoy v. San Francisco, City & County, 14 F.3d 28, 30 (9th Cir.1994) (holding that statute of limitations ran from police commission's final, written decision upholding suspension rather than earlier oral decision). The mere possibility that a decisionmaker might reverse a final decision, however, does not delay the commencement of the running of the statute of limitations. Ricks, 449 U.S. at 260, 101 S.Ct. 498.
 
 
 [11]
 In some cases, a § 1983 claim will not accrue until completion of judicial or administrative proceedings. For instance, a claim of malicious prosecution does not accrue until the plaintiff is acquitted, because acquittal is an element of the claimCabrera v. City of Huntington Park, 159 F.3d 374, 382 (9th Cir.1998). Similarly, we have held that a § 1983 claim for denial of access to the courts due to police officers' perjury accrued when the trial court entered judgments against the plaintiffs, because the cause of action did not exist until the entry of the judgments. Morales, 214 F.3d at 1154-55. This same rule applies in the employment context. When a plaintiff challenges not his termination but his termination without due process, we have held that the cause of action accrues upon the last day of employment. Hoesterey v. Cathedral City, 945 F.2d 317, 320 (9th Cir.1991) (holding that a claim of termination without due process did not accrue until the termination decision was final and it became clear that no further process would be forthcoming).
 
 
 [12]
 The parties filed supplemental briefs discussing the impact of the Supreme Court's decision inMorgan on this appeal.
 
 
 [13]
 In appellants' supplemental briefing, they attempt to analogize this case to a Title VII hostile work environment claim. They do so to avail themselves of the more generous continuing violation ruleMorgan applied to such claims. As discussed above, Morgan held that discrete discriminatory acts are not actionable if they are time barred, even when they are related to acts alleged in a timely fashion. 122 S.Ct. at 2072. With respect to hostile work environment claims, by contrast, Morgan held that "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" as long as one "act contributing to the claim occurs within the filing period." Id. at 2074.
 Assuming arguendo that a cause of action analogous to hostile work environment could exist when, as here, a business has been subjected to an alleged pattern of hostile or harassing conduct by a municipality, we nonetheless reject appellants' attempt to liken this action to a Title VII hostile work environment claim. First, appellants' claims are based upon discrete acts, each of which is actionable on its own, rather than "a series of separate acts that collectively constitute one `unlawful ... practice.'" Id. Second, because appellants did not make this argument in the district court, it is waived. Hawaiian Rock Prods. Corp. v. A.E. Lopez Enters., Ltd., 74 F.3d 972, 976 (9th Cir.1996).
 
 
 [14]
 We review a district court's grant of summary judgment de novoDevereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir.2001) (en banc). In reviewing the grant of summary judgment by the district court, we construe the evidence in the light most favorable to appellants. Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). Summary judgment is appropriate only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 [15]
 The City seeks attorney fees under 42 U.S.C. § 1988(b). Under that statute, a prevailing defendant may recover only if the action is "frivolous, unreasonable, or without foundation."Vernon v. City of Los Angeles, 27 F.3d 1385, 1402 (9th Cir.1994). Here, the action was far from frivolous. Accordingly, the City's motion is denied.