**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE COMMITTEE CONCERNING
COMMUNITY IMPROVEMENT; SOUTH
UNITED NEIGHBORS; DAVID CANO;
MANUEL ASPIN; HORTENSIA FRANCO;
ENA LOPEZ; GRISELDA MARTINEZ;
SALVADOR GUTIERREZ MARTINEZ;
JUAN MERCADO; MAGDALENA
MERCADO; JUAN PEREZ; GLORIA
PIMENTEL; ALFONSO RIVERA;
DARREN SCHAEFFER,
            *Plaintiffs-Appellants,*

                v.

CITY OF MODESTO; COUNTY OF
STANISLAUS; STANISLAUS COUNTY
SHERIFF,
            *Defendants-Appellees.*

Nos. 07-16715
07-17407

D.C. No.
CV-04-06121-LJO-
DLB

OPINION

On Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
May 11, 2009—San Francisco, California

Filed October 8, 2009

14361

Before: Mary M. Schroeder and Stephen Reinhardt,
Circuit Judges, and Louis H. Pollak,* Senior District Judge.

Opinion by Judge Pollak

---

*The Honorable Louis H. Pollak, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

## COUNSEL

Brian Brosnahan, KASOWITZ, BENSON, TORRES, & FRIEDMAN LLP, San Francisco, California, for the appellants.

John E. McDermott, HOWREY LLP, Los Angelos, California, for appellee City of Modesto.

Terrence J. Cassidy, PORTER SCOTT, Sacramento, California, for appellee County of Stanislaus.

_____

## OPINION

POLLAK, *District Judge*:

Appellants (who were plaintiffs in the District Court, and will be referred to as "plaintiffs" here) are residents of four predominantly-Latino neighborhoods, as well as two community groups each representing a neighborhood. The neighborhoods are outside the city of Modesto ("City") and within the City's "sphere of influence" although not incorporated into the City proper; such neighborhoods are known as "unincorporated territory" or "islands." The Modesto sphere of influence includes 26 such unincorporated islands partly or completely surrounded by the City (including the four plaintiff islands) and other unincorporated areas.

Plaintiffs filed a complaint in the District Court in 2004, claiming that the actions (and inactions) of the defendants City and Stanislaus County in failing (1) to provide the neighborhoods with adequate municipal services and (2) to bring the neighborhoods into the City constituted intentional discrimination based on race or ethnicity, in contravention of the Constitution and federal statutes, and also of California statutes. The complaint was amended three times. In a series of opinions in the spring and summer of 2007, the District Court granted motions for summary judgment that were addressed to the Third Amended Complaint (TAC); the plaintiffs' claims were dismissed in their entirety. In a further opinion, the District Court awarded costs to the defendants. Plaintiffs timely appealed these adverse decisions.

## I.   Background

Plaintiffs' neighborhoods are known as Bret-Harte, Hatch-Midway (or No-Man's Land), Robertson Road, and Rouse-

Colorado (or the Garden). These neighborhoods are urban, residential developments which were built in the 1940s and 1950s. At that time, builders were not required to construct infrastructure such as sewers, street lights, sidewalks, curbs, or gutters. Census data show that in 1980 the neighborhoods' populations were not predominantly-Latino; however, by 1990 the Latino population in each of the four neighborhoods had increased substantially although did not yet constitute a majority of the population. By 2000 all four neighborhoods were majority-Latino. According to the Third Amended Complaint ("TAC"), they "resemble neighboring parts of Modesto in terms of residential density, but are easily differentiated by the lack of basic services such as sidewalks, street lights and road maintenance." TAC ¶ 36.

It is undisputed that the neighborhoods lack a variety of infrastructure needs commonly associated with urban communities. Hatch-Midway lacks sewer lines, storm drains, sidewalks, curbs, and gutters. Bret-Harte is connected to the City sewer system, but lacks storm drains, curbs, gutters, and sidewalks. Rouse-Colorado lacks sewer connections, sidewalks, storm drains, curbs, and gutters. Robertson Road has been approved to connect to the City sewer system but lacks storm drains, curbs, gutters, and sidewalks.

The City and the County have a stated policy of encouraging the elimination of urban islands through annexation into the City. Annexation can offer many benefits to a community, including the provision of municipal services by the City and the ability to vote in City elections. However, various steps need to be taken before a community can be annexed, including determining whether the community wants to be annexed, what governmental authority will receive what percentage of property tax revenues, and whether the infrastructure present in the community meets the City's standards.

With regard to taxes, the City and the County must agree on how property tax revenues from the area to be annexed

will be shared. If an unincorporated area is not annexed by the City, all property tax revenues go to the County. In 1983, the City and the County entered into a Master Tax Sharing Agreement ("MTSA"). The MTSA provides that for all covered communities, upon annexation, the City will take 34% of property tax revenues and the County will take the rest. Certain communities are specifically exempted from the MTSA, and in order for these communities to be annexed, the City and County need to enter into a separate tax-sharing agreement. In 1983, Bret-Harte and Robertson Road were excluded from the MTSA. In 1988, Bret-Harte applied for annexation, but the attempt failed, allegedly in part because the City and the County could not agree on the division of property tax revenue. The MTSA was amended in 1996, and at that time Hatch-Midway was specifically exempted. The MTSA was also amended in 2004 to include a portion of land adjacent to Bret-Harte that had previously been excluded. At the same time, the remaining provisions of the MTSA were "expressly reaffirmed." ER 1465. According to the TAC, exclusion from the MTSA is problematic because:

> The disparate treatment of the Plaintiff Neighborhoods under the Master Tax Sharing Agreement creates a disincentive for the County to build infrastructure in the Plaintiff Neighborhoods since building such infrastructure to City standards does not assure that the City will not demand additional financial concessions from the County by way of tax sharing as a prerequisite to annexation of the Plaintiff Neighborhoods. The disparate treatment of the Plaintiff Neighborhoods under the Master Tax Sharing Agreement also imposes a chilling effect on Plaintiffs' own annexation efforts. Plaintiffs reasonably view the annexation application process as futile and/or disproportionally weighted against their prospects of annexation and therefore are less willing to undertake the burdensome process of applying. The Master Tax Sharing Agreement thus deters infra-

structure development in the Plaintiff Neighbor-
hoods and makes it relatively easier for residents of
predominantly-White unincorporated areas covered
by the Master Tax Sharing Agreement to become
Modesto citizens.

TAC ¶ 61.

Plaintiffs contend that exclusion from the MTSA deters the
County from investing in infrastructure in neighborhoods that
would otherwise be eligible for infrastructure upgrades and
annexation. They argue that the County is unwilling to invest
in developing infrastructure in a community without substan-
tial assurance that the City will negotiate a tax-sharing agree-
ment and annex the community. For those communities
covered by the MTSA, this threshold concern is inapplicable.

In addition to dealing with tax-sharing issues, island neigh-
borhoods also face issues relating to sewage disposal. The
County has no sewage treatment plant of its own, and the City
is not required to provide sewer services to non-annexed com-
munities, some of which have aging and deteriorating septic
systems. In 1979, Measure A was passed by Modesto City
voters, prohibiting the City from authorizing any extensions
of sewer trunk lines to unincorporated areas without first
holding an advisory election.[1] In 1995, Measure M was
passed, extending the requirement of an advisory election
from one applying only to the extension of sewer trunk lines
to one that applied before any sewer improvements at all
could be made in unincorporated areas. In 1998, the City
Council approved a resolution adopting an implementation
policy for Measure M. The implementation policy divides
islands into two categories—"substantial" and "insubstantial."
According to the policy, the City Council has the sole discre-
tion to deem islands substantial or insubstantial (the terms are

---

[1]Residents of the island territories are not City residents and cannot vote
in City elections.

not defined in the policy). Substantial islands are not eligible for Measure M votes "until negotiations with the County regarding fiscal issues are complete," while insubstantial islands can have a Measure M vote without the need for fiscal negotiations between the City and County. Fiscal negotiations, it seems, require that the County agree to install all non-sewer infrastructure, including storm drains, curbs, gutters, sidewalks, street lighting, and streets, all to City standards. This is known as the "infrastructure condition."

Plaintiffs argue that the City's policies with regard to the provision of sewer access are applied in a way that discriminates against them. Plaintiffs contend that the determination of what is a "substantial" island has been applied in an inconsistent, discriminatory way, and the infrastructure condition has been imposed only on Latino islands and not on majority-white islands, which have had Measure M votes before all infrastructure was built.

With regard to the status of sewage disposal in the plaintiff neighborhoods, Bret-Harte has sewer access and Robertson Road was approved for sewer access. Rouse-Colorado and Hatch-Midway do not have sewer access, though the two individual plaintiffs residing at the border of Rouse-Colorado have been able to hook up to a sewer line running at the edge of the neighborhood. The septic systems in Rouse-Colorado and Hatch-Midway are failing, causing untreated sewage to leach into groundwater and potentially creating a public health hazard.[2] The County, after determining that it did not have the financial ability to fulfill all of the infrastructure needs of the area including Hatch-Midway, postponed the

---

[2]Whether or not the systems are actually failing may be a disputed issue. It is undisputed that, at the very least, the potential of failing septic systems is acknowledged by and is of concern to the City and the County. The District Court noted that because all disputed issues must be viewed in the light most favorable to plaintiffs, the septic systems were considered to be failing.

building of infrastructure and sewer access in Hatch-Midway but did build infrastructure and sewers in some of the neighborhood surrounding Hatch-Midway (known as Shackleford). With regard to Robertson Road, as a result of the public health crisis resulting from the leaching of sewage into groundwater, the City made an exception to the infrastructure condition and entered into an agreement with the County to build sewers (but no other infrastructure) in 2004. However, plaintiffs allege that despite the known urgency of the need for sewer services in Rouse-Colorado and Hatch-Midway, the County has given priority to the building of other infrastructure, such as storm drains, in predominantly-white communities. Plaintiffs allege that this priority practice is faulty and discriminatory.

Another issue facing non-annexed communities is the provision of law-enforcement services and emergency responders. As with sewer services, the City is not required to provide these services to communities not part of the City, so all law-enforcement and emergency-response personnel are provided by the County. Plaintiffs allege that the time it takes for County law-enforcement personnel to respond to calls for service in their neighborhoods is longer in part because County sheriff deputies must often drive through City territory to respond to calls from island neighborhoods. Plaintiffs also allege that the response times within the unincorporated island communities are longer for the predominantly-Latino island neighborhoods than for the predominantly-white island neighborhoods.

## II.    Proceedings Before the District Court

Plaintiffs filed a complaint against the City, the County, and other defendants in the District Court for the Eastern District of California on August 18, 2004. The original complaint alleged violations of the Fair Housing Act in the defendants' failure to provide municipal services to the plaintiff neighborhoods, violations of equal protection in the defendants' imple-

mentation of their annexation decisions, violations of Title VI in the defendants' land use and municipal services policies, violations of the California Fair Employment and Housing Act, violations of other provisions of the California Code, and nuisance.

Defendants filed a motion to dismiss, and some of plaintiffs' claims, including their claims under the Fair Housing Act, were dismissed. Plaintiffs subsequently filed a First Amended Complaint on April 6, 2005. The City moved to dismiss the First Amended Complaint as inconsistent with the prior order on the motion to dismiss. Pursuant to a stipulation, plaintiffs withdrew the First Amended Complaint and filed a Second Amended Complaint on May 24, 2005. Plaintiffs then agreed, on August 31, 2005, to limit their claims regarding inadequate municipal services to three areas: sewers, police services, and bilingual assistance. Plaintiffs then sought, and were granted, leave from Magistrate Judge Beck to file the Third Amended Complaint.

The Third Amended Complaint included five counts. The first two counts, brought pursuant to 42 U.S.C. § 1983, allege intentional discrimination in violation of equal protection as guaranteed by the Fourteenth Amendment and by Title VI of the Civil Rights Act (codified at 42 U.S.C. § 2000(d)) in (1) the exclusion of three of the plaintiffs' neighborhoods from the MTSA between the City and the County; (2) the City's application of its Measure M policy concerning the extension of sewer infrastructure; (3) disparate provision of emergency law-enforcement services; and (4) the County's policies regarding funding and construction of public infrastructure. The third count was brought under the Fair Employment and Housing Act ("FEHA"), and California Government Code § 12955(l), and alleges that the City and County provide municipal services in a manner that discriminates against the plaintiff neighborhoods. The fourth count alleges violations of California Government Code § 11135 in the provision of

municipal services, and the fifth count alleges common law and statutory nuisance.

Defendants filed four separate summary judgment motions pursuant to an order from the District Court dividing the issues for summary judgment. In their memoranda in opposition to the motions, plaintiffs presented, among other evidence, expert reports and statistical analysis purporting to show the discriminatory impact of the City's and County's actions. The District Court granted the motions for summary judgment in their entirety.

In the first opinion on summary judgment, issued May 16, 2007, the District Court reviewed plaintiffs' claims alleging intentional discrimination in the exclusion from the MTSA. The District Court rejected plaintiffs' statistical evidence with regard to MTSA, in part because the court found that the statistics did not compare the plaintiffs' neighborhoods with the entire Latino population in the unincorporated areas. The District Court also found that the proffered evidence of impact was not sufficient to show evidence of intent; the court found that the one failed annexation attempt of Bret-Harte did not demonstrate intent, and neither did allegedly discriminatory statements of city officials. As a result of this conclusion, the District Court also held that plaintiffs' Title VI claims must fail because those claims also require proof of intentional discrimination. In addition to this finding, the District Court held that the statute of limitations would bar plaintiffs' MTSA claims. Finally, the District Court concluded that plaintiffs' California FEHA claims had been abandoned, and that the § 11135 claim would otherwise be able to proceed but was barred by the statute of limitations.

The second opinion, issued May 23, 2007, dealt with plaintiffs' sewer-access claims, which alleged intentional discrimination in the City's implementation of the Measure M policy. The District Court again rejected plaintiffs' evidence on this set of claims, finding that neither the statistical nor historical

evidence proffered showed discriminatory impact or intent. This conclusion led the District Court to grant summary judgment to defendants on the equal protection claim as well as the Title VI claim. With regard to the § 11135 claim for sewer services, the court found that plaintiffs did not state a prima facie case because they did not show a disparate impact.

The third opinion, issued July 2, 2007, was directed at claims filed only against defendant County, and granted summary judgment on plaintiffs' claims of discrimination in the response times of law enforcement and the provision of bilingual police officers and emergency responders. The District Court concluded that there was no evidence of slower response times in the plaintiff communities and thus there was no evidence of discriminatory impact or discriminatory intent. The District Court also found that bilingual services were provided in a way rationally related to a legitimate government purpose.

The District Court's fourth opinion, of July 30, 2007, also only concerned the County, and granted summary judgment on plaintiffs' claims of discrimination in the prioritization of infrastructure needs. The District Court found that the County's priority list passed rational basis review and was not unconstitutionally arbitrary. The District Court issued another opinion on August 21, 2007, granting summary judgment to defendants on plaintiffs' claims of discrimination in the provision of parks, allocation of state government funding, and creation of a common law nuisance. (None of these claims are raised in this appeal.) The District Court, in this opinion, also declined to exercise supplemental jurisdiction over plaintiffs' other state law claims. Finally, the District Court, on December 11, 2007, awarded defendants $36,430.58 in costs.

## III.   Standard of Review

The District Court, in 2004, dismissed plaintiffs' Fair Housing Act claims under Federal Rule of Civil Procedure

12(b)(6). This dismissal is reviewed *de novo*. *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595 (9th Cir. 2004). The District Court also issued the series of opinions granting defendants' motions for summary judgment. The grant of summary judgment on these claims is also reviewed *de novo*. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 360 (9th Cir. 2005). The District Court's award of costs to defendants is reviewed for abuse of discretion. *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1001, 1010 (9th Cir. 1998).

## IV.    Discussion

### A.    Statute of Limitations

Plaintiffs filed their original complaint on August 18, 2004. The City and County argue that plaintiffs are barred from making any claims based on events that occurred before 2002 because plaintiffs' federal claims are subject to a two-year statute of limitations.[3] In considering statute of limitations issues, the court is to "look at when the operative decision occurred" and to "separate from the operative decisions those inevitable consequences that are not separately actionable." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002) (internal citations and quotations omitted). The District Court found that plaintiffs' claims alleging discrimination in their exclusion from the MTSA were based on the enactments of the MTSA in 1983 and 1996, and the court then found that rather than a continuing violation, any alleged

---

[3]Claims under § 1983 are subject to the state statute of limitations for personal injury claims. In California, that state rule is two years; however, prior to 2003, the rule was one year. The District Court does not appear to have decided whether the two-year or one-year limitation applied. Because we conclude that the plaintiffs can base their claims on the express renewal of the MTSA in 2004, the claim accrued at that time, and the two-year period applies. *See TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) ("a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action").

harm was instead the continuing ill effects of the alleged past violation and therefore the claims were barred.

Plaintiffs put forth two arguments as to why this decision was in error. First, they argue that the continuing violations doctrine preserves their claims against each individual act of discrimination. Second, they argue that the reenactment of the MTSA in 2004 was a separate act for which they can seek redress.

[1] The continuing violations doctrine permits a plaintiff to sue for all discriminatory acts that occurred during the limitations period, even if the policy or other event giving rise to the discrimination occurred outside the limitations period. A plaintiff must show that a pattern or practice of discrimination creates an ongoing violation. However, discrete discriminatory acts will not create a pattern of discrimination without more; pattern-or-practice claims cannot be based on "sporadic discriminatory acts" but rather must be based on "discriminatory conduct that is widespread." *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

The District Court correctly concluded that plaintiffs had not shown the existence of a pattern or practice of discrimination but rather ongoing harm resulting from earlier discrete decisions. Though plaintiffs argue that the earlier decisions (the 1983 and 1996 MTSA enactments) were "applied by conduct throughout the limitations period," they offer no evidence of this. Plaintiffs' claim under the MTSA is that it "chills" their annexation attempts (a claim discussed in greater detail below, *see infra* Part III(B)(1), but any chilling flows inexorably from the MTSA itself and not from any actions of defendants subsequent to the MTSA.

[2] However, though plaintiffs cannot show an ongoing violation, the re-enactment of the MTSA in 2004 will preserve plaintiffs' claim that their exclusion chills their annexa-

tion attempts. ER 1465. The question is whether the re-enactment was "the inevitable consequence of an earlier decision" or instead "the result of independent consideration." *RK Ventures, Inc.*, 307 F.3d at 1061; *Knox v. Davis*, 260 F.3d 1009, 1014 (9th Cir. 2001). The 2004 agreement is entitled the "First Amendment to Master Property Tax Sharing Agreement." The main thrust of the agreement is the inclusion of a particular piece of property that had been previously excluded. Section Three of the agreement provides that: "[e]xcept as herein amended, the provisions of the Agreement are expressly reaffirmed and remain in full force and effect."

[3] The District Court erred in dismissing the 2004 agreement as merely an automatic renewal of a past action. Instead, the 2004 agreement expressly altered some of the terms of the former agreement and retained other terms, such as the exclusion of the plaintiffs' neighborhoods. The City's contention that the 2004 agreement was "an unrelated discrete act of no relevance to this case" is not persuasive; part of plaintiffs' claim is that they were intentionally excluded from the MTSA, and the agreement in 2004 expressly provided for retention of the MTSA provisions not amended. Moreover, the 2004 agreement was not merely an inevitable consequence of the 1983 and 1996 agreements, because one of the consequences of those agreements was to exclude the parcel that the 2004 agreement instead included.[4]

[4] The District Court erred in finding plaintiffs' MTSA challenge barred by the statute of limitations. Because this conclusion stems from the 2004 MTSA re-enactment, plaintiffs may not challenge the 1983 or 1996 MTSA, but they may

---

[4]The MTSA's 2004 amendment and re-enactment happened just a few months before plaintiffs filed their complaint; though the original complaint did not include allegations based on the 2004 agreement, it did include allegations based on the exclusion from the MTSA. When allegations specific to this event were included in the TAC, they were permissible as relating back to the original pleading.

use those events "as evidence to establish motive and to put [their] timely-filed claims in context." *Carpinteria Valley Farms v. City of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003).

## B.   Statistical Evidence

Plaintiffs' § 1983 claims alleging violations of equal protection and Title VI require similar proofs—plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class. *Lee v. City of Los Angeles*, 250 F.3d 668, 686-87 (9th Cir. 2001). Where, as here, the challenged governmental policy is "facially neutral," proof of disproportionate impact on an identifiable group, such as evidence of "gross statistical disparities," can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977); *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-08 (1977).

Plaintiffs contend that "gross statistical disparities" alone may constitute proof of a practice of discrimination and relieve plaintiffs from their burden of showing intent to discriminate. *Hazelwood*, 433 U.S. at 307-08. This is true, but it is the rare case where impact alone will be sufficient to invalidate a challenged government action. *See Arlington Heights*, 429 U.S. at 266 (noting that absent evidence of very stark statistical disparities, "impact alone is not determinative, and the Court must look to other evidence.")

In addition to statistical evidence showing discriminatory impact, other factors to be considered in determining whether there is evidence of intent or purpose to discriminate include: the historical background of the decision, the sequence of events leading up to the decision, and any relevant legislative or administrative history. *Arlington Heights*, 429 U.S. at 267-

68. If there is no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest. *Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993).

### 1.    Exclusion from the MTSA

Plaintiffs claim that three of their neighborhoods were excluded from the MTSA because of their predominantly-Latino population, and that this exclusion constitutes a barrier to annexation erected by the City and County.[5] In support of this claim, plaintiffs put forth statistical evidence comparing the ethnicity of the population in the three plaintiffs' neighborhoods excluded by the MTSA to those covered by the MTSA.[6] The differences in the proportions of Latinos in the areas excluded and included are statistically significant. Overall, according to the 2000 census, the islands excluded from the MTSA were 71% Latino, while the islands included in the MTSA were 48% Latino.

---

[5]Defendants contend that no claims based on the MTSA are properly presented in this appeal. They argue that the MTSA annexation claim—whether characterized as (1) stating a claim for the discriminatory creation of a "barrier to annexation" or (2) stating a claim simply for discriminatory annexation—is barred by previous orders in this case. We view the claim as not one alleging that the annexation process, in general, is discriminatory; plaintiffs rest their claim on the creation of "barriers to annexation," a claim that is part of the equal protection claims present in the case from its inception. To the extent that any claims were resolved against the plaintiffs by previous orders in the case, those orders are reviewable as part of this appeal. "An appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the judgment." *United Ass'n of Journeymen & Apprentices v. Bechtel Constr. Co.*, 128 F.3d 1318, 1322 (9th Cir. 1997).

[6]The fourth plaintiff neighborhood, Rouse-Colorado, is not specifically excluded by the MTSA.

In granting summary judgment to defendants on this claim, the District Court rejected plaintiffs' use of census statistics from 2000; older census data show that the neighborhoods were not all majority-Latino at the enactment of the MTSA in 1983 and before the 1996 amendment. However, plaintiffs contend, and the census data show, that the neighborhoods were clearly trending towards becoming majority-Latino over time. Plaintiffs also note that Hatch-Midway, which was excluded by the 1996 MTSA for the first time, had been under 50% Latino in 1980, but had become 55.9% Latino by 1990, and, having become majority-Latino, it was excluded. Moreover, the use of 2000 census data is appropriate for analyzing the 2004 re-enactment of the MTSA. The census data in the record are reproduced below.

| | | **%** | **Latino** |
|---|---|---|---|
| **Neighborhood** | **1980** | **1990** | **2000** |
| Bret-Harte | 32.7 | 56.3 | 76 |
| Hatch-Midway | 40.5 | 55.9 | 74 |
| Robertson Road | 32.5 | 48 | 70 |

Plaintiffs' experts compared the percentage of the population identified as Latino in all the island neighborhoods excluded from the MTSA (71%) to the percentage of the population classified as Latino in the included neighborhoods (47%); the difference in the percentage of the population identified as Latino is statistically significant. ER 228.

**[5]** The District Court found problems with the statistical comparisons made. The District Court concluded, "Plaintiffs selectively analyze the Latino population within each of the three impacted county islands, but do not adequately statistically analyze the Latino population in relation to either the total population or total Latino population." ER 105. How-

ever, this reference to "the total Latino population" is unclear. Plaintiffs did compare the total Latino population in the excluded areas to the total Latino population in the included areas. Moreover, plaintiffs compared the total non-Latino population of the excluded areas to the total non-Latino population of the included areas and found that, using the 2000 census figures, the MTSA included more non-Latinos than it excluded. Defendants contend that plaintiffs' statistics are inconsequential because the islands' populations also include white citizens who "obviously have not been treated any differently from the Latinos in these islands." City Resp. Br. at 34. Defendants do not point to any precedent for conducting this type of within-neighborhood analysis; as the question is whether particular islands have been excluded because of their racial composition, the type of island-to-island comparison conducted by plaintiffs is appropriate.

In addition to this population-based evidence, plaintiffs point to the annexation of two white neighborhoods, El Vista No. 4, a neighborhood but not an island, and Pelandale McHenry, also not an island, as evidence that the City gave preference to those neighborhoods over the Latino neighborhoods. The District Court disregarded this evidence, finding that because those two neighborhoods were not islands they were not similarly situated with the plaintiffs' neighborhoods. Defendants, arguing that the District Court was correct, point out that non-islands do not require County infrastructure funding, so there would be no dispute over tax-sharing. However, this fact would seem to lend support to plaintiffs' contention that the need for their neighborhoods to independently negotiate tax revenues is a barrier to annexation: apparently either inclusion in the MTSA or, in the alternative, non-island status means that negotiations about tax revenues do not, in all instances, need to take place in order for annexation to be accomplished.

[6] Plaintiffs point to the failed annexation attempt by Bret-Harte in 1988, where the inability of the City and County to

timely agree on how tax revenues would be shared doomed the application. Plaintiffs also point to the annexation of Fairview Village (bordering Bret-Harte) in 1996. When evaluating the Fairview Village application, the regional agency charged with regulating annexations recommended that the entire Bret-Harte island be included in the annexation proposal. ER 1499-1509. This recommendation was not adopted, and there is evidence that the proponents of the Fairview Village annexation believed that the inclusion of Bret-Harte in the proposal "would kill the annexation." ER 1509. Plaintiffs also offer the declaration of Juan Mercado, a resident of Bret-Harte, in which he states his belief that Bret-Harte cannot be annexed due to its exclusion from the MTSA and relates his difficulties in persuading his neighbors to support an application for annexation in the absence of the assurance provided by the MTSA. ER 1559. Based on this testimony and the evidence about other annexations, a reasonable factfinder could conclude that exclusion from the MTSA is indeed a barrier to annexation that neighborhoods covered by the MTSA do not face.[7]

Finally, the District Court did not conclude, as a matter of law, that plaintiffs had not shown disparate impact. Rather, the District Court, when analyzing plaintiffs' MTSA claim under the equal protection framework, ruled that, even assuming that the MTSA disparately impacted Latinos, the statistics did not give rise to an inference of intentional discrimination. ER 106. Moreover, although the District Court rejected plaintiffs' statistical evidence in the course of analyzing the MTSA

---

[7]The District Court found that plaintiffs' claims regarding annexation were improper in the absence of any applications, whether successful or not, since 1988. However, plaintiffs correctly point out the "barrier to annexation" theory does not require any applications for annexation, because the problem is that the unresolved tax-sharing barrier chills residents of the excluded islands from even putting an application together. This court cannot determine whether or not exclusion from the MTSA is actually a barrier to annexation; that factual issue cannot be resolved at the summary judgment stage.

claim under equal protection, it did find, in the course of analyzing plaintiffs' companion California Government Code § 11135 claim, that plaintiffs **had** presented some evidence of disparate impact. The District Court stated that it could not "conclude as a matter of law, that a reasonable jury would be unable to find disparate impact." ER 117.[8]

[7] Given the context of the 2004 reenactment, the trend of the neighborhoods to become more heavily-Latino over time, the 1988 unsuccessful Bret-Harte application, and the example of the Fairview Village annexation, we conclude that plaintiffs have presented evidence of discriminatory impact which, in turn, has created a sufficient inference of discriminatory intent to permit them to present their MTSA claim to a factfinder. We will reverse the District Court's decision on this claim.

### 2.    Measure M and the Provision of Sewer Services

Plaintiffs argue that the infrastructure condition—which requires the County to install all infrastructure in an island up to City standards before the City will, pursuant to Measure M, permit City voters to consider extending sewer services to that island—is applied in a discriminatory way. The infrastructure condition is only imposed on islands that the City deems "substantial," and there is no definition of what makes an island substantial. The infrastructure condition was imposed on the Latino areas of Shackelford (79% Latino) (which includes Hatch-Midway) and Robertson Road (70 % Latino), but was not imposed on the predominantly-white islands of Rosemore-Cox (28% Latino), Carpenter-Shaddox (30% Latino), Grecian-McHenry (30% Latino), Pelandale-McHenry

---

[8]Although apparently regarding this state-law claim as having sufficient evidentiary support to warrant submission to a factfinder, the District Court ruled that this claim, like the § 1983 claims, was barred by the statute of limitations. As discussed above, we conclude that this statute-of-limitations ruling was in error.

(5% Latino), and Emerald Elm (31% Latino).[9] ER 1376, 1059-64. Plaintiffs argue that the condition is imposed in an ad hoc, discriminatory fashion.

Of the islands which have had Measure M votes, the combined population is 67% Latino, but the islands which have been deemed insubstantial—and therefore not subjected to Measure M—are undisputedly majority-white. It is undisputed that the difference between the percentage of Latinos in the islands that were and were not subjected to the infrastructure condition is statistically significant. ER 1061. The City contends that this statistical comparison is meaningless, because a comparison of majority-white insubstantial islands with majority-Latino substantial islands ignores the fact that no substantial white island has received a Measure M vote. Plaintiffs use the smaller white islands exempted from the requirement to calculate the statistics. Though the City argues that the rest of the islands should be included in the calculations, the other islands are properly left out of the analysis because they have neither been subjected to nor exempted from the condition yet, as there is no evidence that they have sought a Measure M vote.

Plaintiffs contend that the City's application of the substantial/insubstantial differentiation strengthens the inference of discriminatory intent. It is undisputed that the terms are undefined and that the City has refused to define the terms even in the face of recommendations that it do so. ER 1056. Addi-

---

[9]Some of these neighborhoods were exempted from the infrastructure requirement in 2001, when the City Council voted to approve an immediate Measure M vote for unincorporated islands deemed insubstantial based on their size. The islands of Emerald Elm and Briggs were voted on at this time, while the majority-Latino island of Maze-Spencer, which plaintiffs contend would qualify as insubstantial based on its size, was not mentioned. *See* ER 1425. The parties disagree as to whether Maze-Spencer was considered and not included in setting up the 2001 Measure M vote or whether it was merely overlooked. No plaintiff in this case lives in Maze-Spencer.

tionally, the City does not pay for infrastructure whether it imposes the infrastructure condition or not; the County provides and pays for it. The City's purported concern for the financial aspects of installing infrastructure in a larger island would seem to be less compelling where the City is providing none of the funding for that infrastructure. The City argues that it is trying to manage expectations of annexation, because it is not just sewer access but all infrastructure that is required before annexation can be considered, and that people living in the islands will believe that annexation will naturally follow a Measure M vote, which cannot be the case if the infrastructure is not completed. However, this does not explain why the City would waive the infrastructure requirement for the smaller islands, which will still need the County to provide that infrastructure before they can be annexed. Some of these islands have indeed had a Measure M vote, a vote which has not yet been followed by annexation, and there is no evidence that this situation has resulted in any problems for the City.

[8] It is clear that the infrastructure condition has the potential to have a real effect on the ability of island areas to connect to basic services; as the District Court noted, the "County and the City have put unincorporated County islands in a difficult situation—the County's policy focuses on sewer repair before above-ground improvements, while the City's policy favors an above-ground infrastructure improvement approach before a Measure M advisory vote on sewers. It is undisputed that the City and County policy are at odds." ER 86.

[9] Although the statistics, and the conflicting policies, are troublesome, the reality is somewhat different. Sewer services are provided to only 3 of the 26 unincorporated islands—Bret-Harte, Shackelford, and Robertson Road—which are 76% Latino and 80% minority.[10] Sewer services were extended to the latter two neighborhoods after those islands

---

[10]However, Bret-Harte received sewer access before Measure M was passed.

had become majority-Latino, although it is undisputed that these neighborhoods were subject to the infrastructure condition initially and sewer services were extended to these areas only after the City found that "failing septic systems created a public health crisis." ER 1067. Still, Robertson Road succeeded in obtaining an exemption and getting sewer access, as did part of Shackelford. Moreover, no white island has sewer access—even those islands which have already been the subject of a Measure M vote and are therefore in receipt of permission from City voters to extend the sewer system to reach them. Given this evidence of a lack of disparity in actual access to sewer services, plaintiffs' statistical evidence is insufficient to give rise to an inference of discriminatory intent. The District Court's grant of summary judgment to the City on the sewer issue will be affirmed.

### 3.  Law-Enforcement and Emergency Response Times

Plaintiffs contend that the dispatch time (the time lapse between a call to 911 and the dispatch of an officer) and the total response time (the time lapse between a 911 call and the arrival of an officer on scene, including dispatch time) of emergency and law-enforcement personnel are slower in predominantly-Latino islands than in predominantly-white islands.

The first question is the proper unit of measure. Plaintiffs argue that dispatch time is a more important measure, because that factor is entirely controlled by the individual answering the call, while response time is influenced by other factors such as geographical distance, driving speeds, traffic, and weather. The County contends that the total response time is the only measure that matters in terms of any potentially discriminatory impact because it is what actually affects the individual making the call—the person seeking assistance is concerned simply with the overall time it takes emergency

personnel to arrive. The dispatch times and response times discussed in the District Court's opinion are as follows:[11]

**Dispatch/Response Averages, modified from County's Expert Report** (ER 667)
   –for Jan. 1, 2002 to Aug. 17, 2004

| Location | Dispatch | Total Response Time |
|---|---|---|
| Plaintiff Neighborhoods | 7.2 min | 13.4 min |
| Majority-Latino Islands | 7.0 min | 13.0 min |
| Majority-White Islands | 5.5 min | 12.5 min |
| All Unincorporated | 5.5 min | 13.3 min |

The second issue is one of control. The County asserts that it does not control the dispatch center, Stanislaus Regional 911 (also known as the Dispatch Agency or "SR911"), and so cannot be responsible for any potential issues relating to dis-

---

[11]The District Court also included, but did not discuss, the evidence produced by plaintiffs, which focused on dispatch times. Plaintiffs' statistical evidence is as follows:

**Dispatch Averages, modified from Plaintiffs' Expert Report** (ER 658-589)

| Location | Jan. 1, 2002– Aug. 17, 2004 | Aug. 17, 2004– Dec. 31, 2006 |
|---|---|---|
| Plaintiffs' Neighborhoods | 18.9 min | 13.3 min |
| Majority-Latino Islands | 17.7 min | 12.9 min |
| County Minus Plaintiffs | 15.2 min | 11.5 min |
| Majority-White Islands | 15.2 min | 10.7 min |

Plaintiffs' dispatch numbers vary from defendants' but neither argues that the other's data are incorrect. Neither the District Court nor either party offered an explanation for this discrepancy.

patch time, but only for response time. The County contends that it is only in control of the time it takes a dispatched officer to arrive, which is included in response time. The District Court found that there was a dispute over the level of control the County exercised over SR911 and did not resolve the issue.[12]

The County does not appear to dispute that dispatch times to the plaintiffs' neighborhoods are slower than dispatch times to predominantly-white islands and to the rest of the County. Similarly, plaintiffs do not seem to dispute that Latino unincorporated areas and the plaintiffs' neighborhoods actually had quicker response times for some of the period in question than did the rest of the unincorporated areas. ER 667 (showing that between Aug. 18, 2004 and Dec. 31, 2006, response time to the plaintiffs' neighborhoods was 10.2 minutes and response time to all the unincorporated areas was 11.4 minutes). The District Court concluded that "while the dispatch times are slower, the response times by the Sheriff deputies are quicker, yielding no meaningful difference for residents of Latino Unincorporated Areas who call 911. The difference, if at all, is reduced to seconds." ER 59, 66.

However, the difference in dispatch time between the plaintiff neighborhoods and majority-white islands was, between 2002 and 2004, at a minimum, almost two minutes (the difference between the 7.2 minutes that the County asserts it took for officers to be dispatched to the plaintiff neighborhoods and the 5.5 minutes it took for officers to be dispatched to majority-white islands during that same period). At a minimum, the difference in response times, according to the County, for that same period was almost one minute (the difference between the 13.4 minutes it took to respond to calls in the plaintiffs' neighborhoods and the 12.5 minutes it took to respond to calls in the majority-white islands). Plaintiffs' expert has asserted that these differences are statistically sig-

_____

[12]The Dispatch Agency had previously been named as a defendant, but was dismissed in an order in 2004.

nificant; defendants' expert asserts that these numbers do not represent a "meaningful difference." ER 668. The County offers no reason why dispatch times should be different between neighborhoods; there is some testimony in the record indicating that differences in dispatch times would be "unusual." ER 584.

The County's argument that response time is the most important measure to the person waiting for the police to arrive has weight, and plaintiffs have shown that, even looking only to response time, the differences between the time to respond to the plaintiffs' neighborhoods and the majority-white islands is statistically significant. Morever, the County's focus on response time ignores the fact that dispatch time is a component of response time—presumably, if dispatch times were more equitable, response times would follow suit.

**[10]** This court cannot agree that, as a matter of law, a difference of one minute can be characterized as not making a "meaningful difference" when one is waiting at one's home for law-enforcement or emergency personnel to arrive, particularly in the absence of any explanation for why the time difference exists. A factfinder should decide if the difference is material and if so if the difference is explainable on grounds other than the ethnicity of the population of the neighborhoods or if plaintiffs have proved that the County has intentionally discriminated against them in the provision of law-enforcement services. The grant of summary judgment to the County on plaintiffs' law enforcement claim will be reversed.

**[11]** The issue of whether and to what extent the County controls the Dispatch Agency was not resolved by the District Court and cannot be resolved by this court. On remand, the District Court should consider whether the County can be responsible for the Dispatch Agency as a matter of law, or whether there are issues of fact regarding the control of the Dispatch Agency that cannot be resolved at the summary judgment phase.

### 4.    Provision of Infrastructure

This claim concerns a "Priorities List" the County adopted in 2004 in order to set out priorities for the construction of infrastructure. Plaintiffs contend that despite the acknowledged fact that the most pressing need in the County was for sewers in areas with failing septic systems, the County ignored this need in order to construct other, less important, infrastructure in predominantly-white communities. Specifically, they challenge the choice to construct storm drainage in Keyes, South Ceres, and Salida instead of sewers in Hatch-Midway and Rouse-Colorado or storm drainage in any of the plaintiffs' neighborhoods. Plaintiffs also argue that even if there was not intentional discrimination, the Priorities List is so arbitrary that it is not rationally related to a legitimate government purpose and so fails an equal protection challenge under rational basis review.

The District Court found that the Priorities List, as a whole, did not favor white neighborhoods over Latino neighborhoods and that because the "undisputed evidence is that **all** the neighborhoods on the Priorities List have infrastructure needs for which there is not enough money" there was not enough of a disparate impact on the Latino neighborhoods to raise an inference of discriminatory impact. ER 39 (emphasis in original). The District Court also found that the County's "actions can be explained by a myriad of community and planning concerns having nothing to do with the ethnicity" of the plaintiffs' neighborhoods. ER at 44.

Plaintiffs contend that the County's shifting around of the order of priorities on the list is evidence of procedural irregularity in the decision-making. For example, the construction of sewers in Hatch-Midway was third on the list as part of the project of constructing sewers in the larger neighborhood of Shackelford (which includes Hatch-Midway) but was dropped to eleventh when the County found the cost of putting sewers into the whole Shackelford neighborhood was too expensive

and scaled back the project. However, the person who created the Priorities List testified at a deposition that the list was simply that—a list of needed things, with no actual intent to rank any infrastructure need over any others. ER 34. The list was then adopted by the Board of Supervisors as a priority list in 2004.

Plaintiffs point out that the construction of storm drainage in advance of the construction of sewers violated the County's own policies of making sewers the highest priority, using funds to serve the most urgent needs of the greatest number of people, and developing infrastructure in island neighborhoods to promote annexation. Constructing storm drainage in Keyes is not inexpensive, and, according to plaintiffs, actually far more expensive than installing sewers or storm drains in the plaintiffs' neighborhoods. *See* App. Reply Br. 42-43 (charts comparing costs). The County, in addition to arguing that the Keyes storm drains project actually benefitted a significant Latino population, contends that Keyes was in more dire need of storm drainage than some of the plaintiff neighborhoods were in need of sewer access, because Keyes is overwhelmed during rainstorms with significant water and the septic systems in Hatch-Midway and Rouse-Colorado are not failing. Plaintiffs dispute this, contending that the storm water in Keyes is not nearly as bad as the storm water in Bret-Harte or the septic needs in Hatch-Midway. In the context of a motion for summary judgment, these disputed facts must be construed in plaintiffs' favor and therefore we are required to assume that the needs in Keyes were not as pressing as the needs in the plaintiffs' neighborhoods. However, it is also the case that the Priorities List as a whole places some projects in Latino neighborhoods above some projects in white neighborhoods.

[12] Setting aside the issue of ranking the relative direness of the need, all of the items on the Priorities List represent needed infrastructure, and some of the plaintiffs' neighborhoods, such as Robertson Road, have already received the

benefit of significant infrastructure construction. There may have been some irregularities with the decision to build the Keyes storm drains before sewers in the plaintiff neighborhoods; however, in the context of many County-wide infrastructure needs and the need of the County to utilize limited sources of funding, in addition to testimony of the creator of the list that the list was not intended to rank projects, there is not sufficient evidence to give rise to an inference of discriminatory intent.

**[13]** With regard to the plaintiffs' claim that the Priorities List and the construction of storm drainage failed even rational basis review, the County was entitled to summary judgment. The County presented reasons why it chose to undertake certain projects first, reasons largely related to the sources of the funding for the projects and the need to construct subsurface infrastructure before ground-level infrastructure; the County was permitted to take these factors into account. Despite plaintiffs' view that their neighborhoods face the most pressing infrastructure problems, there is no requirement that the County "order the list according to need." App. Br. 57. The County's actions will be upheld as long as they bear a rational relation to a legitimate government purpose—the actions do not have to be the wisest or most efficient options for government action. Because it is undisputed that all the projects on the list were needed, the creation of the Priorities List bears a rational relation to infrastructure needs in the County.

The District Court's grant of summary judgment to the County on plaintiffs' infrastructure claim will be affirmed.

## C.   The Fair Housing Act and Post-Acquisition Claims

**[14]** The Fair Housing Act, 42 U.S.C. § 3604(b), makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith,

because of race, color, religion, sex, familial status, or national origin." HUD, the agency tasked with implementing the FHA, has enacted regulations relating to § 3604. 24 C.F.R. § 100.65 prohibits "failing or delaying maintenance or repairs of sale or rental dwellings" or "limiting the use or privileges, services, or facilities associated with a dwelling" because of discrimination. Plaintiffs' allegations under the FHA are as follows:

> Defendants have discriminated in the provision of services and facilities in connection with Plaintiffs' housing including but not limited to an ongoing discriminatory failure to provide adequate law enforcement protection and emergency services, and other basic services such as lighting and sidewalks, street maintenance, refuse removal, and drainage to Plaintiffs based in substantial part on the race, ethnicity, ancestry, color or national origin of the residents of the Latino Unincorporated Neighborhoods, in violation of 42 U.S.C. 3604(b).

ER 1655, Compl. ¶ 85.

As a general matter, FHA claims are evaluated under the burden-shifting framework of the Title VII discrimination analysis and may be brought under theories of both disparate treatment and disparate impact. *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008). To establish a prima facie case of disparate impact, "a plaintiff must show at least that the defendant's actions had a discriminatory effect." *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988). This requires proof of "(1) the occurrence of certain outwardly neutral . . . practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices." *Pfaff v. U.S. Dep't of Housing and Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996) (citing *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)). A defendant may then

rebut a plaintiff's proof of disparate impact by "supply[ing] a legally sufficient, nondiscriminatory reason." *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006) (quoting *Pfaff*, 88 F.3d at 746-47).

Plaintiffs' FHA claims were dismissed by the District Court in 2004; the court held that plaintiffs could not state an FHA claim because the statute is limited to "discrimination in the provision of services in connection with the acquisition of a dwelling," rather than discrimination in the provision of services to existing homeowners and renters.

This court, in prior instances where we have considered claims brought under the FHA, has not differentiated between claims based on whether the alleged discrimination occurred at the time of or after the acquisition of the housing. For example, in *Ojo v. Farmers Group, Inc.*, 565 F.3d 1175 (9th Cir. 2009), we recently addressed the FHA in the context of discrimination in homeowner's insurance rates.

We have also held, in *Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999), that a plaintiff who claimed she was subject to eviction notices following her complaint of race discrimination could state a claim under the FHA. In *Harris*, after the plaintiff, an African-American woman, sought the assistance of a local housing organization, the organization employed housing testers to confirm her complaint that the defendant landlord treated prospective African-American and white tenants differently. We held that plaintiff could pursue her FHA claim, finding that she had standing because she was an "aggrieved person" under the Act and that she had established a "prima facie disparate treatment claim" under the Act. Again, we did not make any distinction based on the fact that the plaintiff's claim (which was related to her eviction) had necessarily arisen after she acquired the housing.

The Seventh Circuit has also grappled with this issue. In *Halprin v. Prairie Single Family Homes of Dearborn Park*

*Assoc.*, 388 F.3d 327 (7th Cir. 2004), plaintiffs were Jewish homeowners who contended that their property was vandalized and they were harassed because of their religion. The court concluded that § 3604 of the FHA was generally concerned with the provision of services in connection with access to housing and not problems with the provision of services after the sale or rental. The court did permit, *dubitante*, plaintiffs' claim to proceed under a different part of the statute. Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606" of the FHA. Implementing this part of the statute is a regulation which prohibits "threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." 24 C.F.R. § 100.400(c)(2). The court found that the regulation unmoored § 3617 from its tie to § 3604 and so permitted a claim based on interference with "enjoyment of a dwelling" that has taken place after the dwelling has been acquired. In so doing, the court expressed doubt as to the validity of this regulation, noting that the language of the regulation may stray too far from its statutory authorization to be permissible, but finding that its validity was, in that case, unchallenged.[13] With regard to § 3604 itself, the court found that "[a]s a purely semantic matter the statutory language might be stretched far enough to reach a case of 'constructive eviction.' " *Halprin*, 388 F.3d at 329.

The Seventh Circuit revisited the issue of post-acquisition claims in *Bloch v. Frischholz*, 533 F.3d 562 (7th Cir. 2008). The plaintiffs in *Bloch* contended that the removal, pursuant to a rule in the condominium association preventing the place-

---

[13]The applicability of § 3617 is not at issue in this case.

ment of "objects of any sort" on their doorposts, of the mezuzot hanging outside their doors, violated the FHA. The court construed *Halprin* as holding that "harassment of owners or tenants does not violate the Fair Housing Act or its regulations" save where "harassment so severe that it amounts to constructive eviction might be equated to making a dwelling unavailable." *Id.* at 563-64. The court found that although plaintiffs claimed they were constructively evicted because they could not live in a place where they could not appropriately display the mezuzot, the rule was in fact a neutral rule and no accommodation was required.

One judge dissented. The dissenting judge was of the view that *Halprin* did not squarely address the § 3604 issue, as that court rested its holding on a regulation implementing § 3617. The *Bloch* dissent found that "nothing in the statute compels" an interpretation that limits the statute's application to pre-acquisition claims. *Bloch*, 533 F.3d at 571. Further, the dissent observed that even if the statutory language is ambiguous, the HUD regulations, including 24 C.F.R. § 100.65(b)(4) are reasonable and entitled to deference under *Chevron v. NRDC*, 467 U.S. 837 (1984), and that those regulations permit post-acquisition claims.[14]

Some courts have followed the Seventh Circuit's decision in *Halprin* and found that the FHA does not apply to post-acquisition claims. *See Cox v. City of Dallas*, 430 F.3d 734, 745 (5th Cir. 2005). Other courts have permitted post-acquisition FHA claims to go forward. *See United States v. Koch*, 352 F. Supp. 2d 970, 977 (D. Neb. 2004) (denying defendant landlord's motion for judgment as a matter of law

---

[14]En banc review has been granted in the *Bloch* case, and that court has invited the United States to participate as *amicus curiae*. The United States has since filed a brief urging the court to find that the FHA reaches claims of post-acquisition discrimination because "[n]othing in the statute indicates that it is limited to discrimination in the initial sale or rental transaction." Brief for the United States as Amicus Curiae at 15, *Bloch v. Frischholz*, No. 06-3376 (7th Cir. Jan. 16, 2009).

and finding that tenants' post-acquisition sexual harassment claims under § 3604 could proceed); *Richards v. Bono*, 2005 WL 1065141, *3-4 (M.D. Fla. 2005) (differentiating the rental context, where the discrimination on the rental of the dwelling can be ongoing, from the sale context where the buyer and seller relationship quickly concludes); *Landesman v. Keys Condo. Owners Ass'n*, 2004 WL 2370638, *2 (N.D. Cal. Oct. 19, 2004) (permitting challenge to condominium association facilities rules alleging discriminating against families with children).

For the reasons that follow, we conclude that the FHA reaches post-acquisition discrimination:

**[15]** First, the statutory language does not preclude all post-acquisition claims. The statute prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). The inclusion of the word "privileges" implicates continuing rights, such as the privilege of quiet enjoyment of the dwelling. While defendants argue that "the provision of services or facilities in connection therewith" refers only to services or facilities provided at the moment of acquisition in connection with the sale or the rental, this is hardly a necessary reading. There are few "services or facilities" provided at the moment of sale, but there are many "services or facilities" provided to the dwelling associated with the occupancy of the dwelling. Under this natural reading, the reach of the statute encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling.

**[16]** Second, the regulations implementing the FHA, promulgated by the Department of Housing and Urban Development, also support permitting post-acquisition claims. 24 C.F.R. § 100.65, entitled "Discrimination in terms, conditions and privileges and in services and facilities," provides, in pertinent part:

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.

(b) Prohibited actions under this section include, but are not limited to: . . .

  (2) Failing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin . . .

  (4) Limiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person associated with him or her.

The sections prohibiting "[f]ailing or delaying maintenance or repairs of sale or rental dwellings" and "[l]imiting the use of privileges, services or facilities associated with a dwelling" appear to embrace claims about problems arising after the tenant or owner has acquired the property. In common parlance, issues relating to "maintenance or repairs" or "services or facilities associated with a dwelling" tend to be issues arising after the tenant or owner has come into possession of the dwelling and sought out maintenance, repair, or services. *See, e.g.*, *Landesman,* 2004 WL 2370638, *2 (discussing regulation in the context of challenge to condominium association rules placing restrictions on use of the swimming pool by children).

Additionally, limiting the FHA to claims brought at the point of acquisition would limit the act from reaching a whole host of situations that, while perhaps not amounting to con-

structive eviction, would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling. Under so limited a reading of the statute:

> . . . it would not violate § 3604(b) for a condominium owners' association to prevent a disabled person from using the laundry facilities or for a landlord to refuse to provide maintenance to his Hispanic tenants. Similarly, it would not violate § 3604(b) for a landlord to sexually harass a tenant or to raise the rent of only Jewish tenants. It would not violate § 3604(c) for a landlord to use racial slurs to or about existing tenants or to spray-paint such a slur on an occupant's door. Nor would it violate § 3604(c) for a homeowners association to print up flyers denigrating a particular resident due to her religious faith and post them throughout the neighborhood. All of these behaviors would be beyond the law's purview solely because of when they occurred.

Rigel Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. Rev. 1, 32-33 (2008) (asserting that pre-*Halprin* case law found post-acquisition claims under § 3604 permissible, criticizing the *Halprin* decision, and proposing a framework that "focuses less on the point of acquisition and more on the identity of the defendant and the relationship between the parties"). *See also Bloch*, 533 F.3d at 571 (7th Cir. 2008) (Wood, J., dissenting) (noting that permitting post-acquisition claims "will ensure that member of protected groups do not win the battle (to purchase or rent housing) but lose the war (to live in their new home free from invidious discrimination)").

**[17]** In our view, the FHA does apply to post-acquisition discrimination, and the District Court erred in deciding otherwise. However, we will not reinstate plaintiffs' FHA claims

in this case in their entirety. Plaintiffs' factual averments supporting the alleged violations of the FHA are largely the same as the allegations supporting plaintiffs' claims that their rights to equal protection were violated by defendants' actions with regard to municipal services.[15] To the extent the complaint alleged additional violations related to other municipal services, plaintiffs are bound by the 2005 agreement limiting their claims regarding services to the areas of sewer access, police services, and bilingual assistance. We have already concluded that plaintiffs have not put forth evidence of disparate impact with regard to the provision of sewer services or infrastructure. As a result, remanding those claims would be futile because the evidence of the FHA violations would be the same statistical evidence rejected in the course of resolving the equal protection claims. We therefore limit reinstatement of plaintiffs' FHA claims to those regarding the timely provision of law-enforcement personnel.

### D.   State-Law Claims

Plaintiffs have brought several state-law claims under California Government Code § 11135 and the California Fair Employment and Housing Act § 12955 ("FEHA"). The District Court, after consideration of the equities, declined to exercise supplemental jurisdiction over plaintiffs' state-law claims following the dismissal of the federal claims, noting that those claims involved complex and novel questions of state law. The District Court, considering the situations under which a court may decline to exercise supplemental jurisdiction, found that the state-law claims would involve "statutory

---

[15]The complaint alleged that: "Defendants have discriminated in the provision of services and facilities in connection with Plaintiffs' housing including but not limited to an ongoing discriminatory failure to provide adequate law enforcement protection and emergency services, and other basic services such as lighting and sidewalks, street maintenance, refuse removal, and drainage to Plaintiffs."

construction or interpretation and state case law analysis" that "should be resolved by a state court."[16] ER 23.

[18] The District Court's assessment of the state-law claims was assuredly reasonable; hence, dismissal of those claims cannot be characterized as an abuse of discretion. However, the dismissal of the state-law claims came about in the context of the dismissal of all the federal claims. We are reinstating certain of the federal claims and remanding for further proceedings. It is not impossible that the District Court would be more hospitable to entertaining the state-law claims when addressed as companions to cognate federal claims. To permit the District Court to consider whether it would, in the context of addressing the reinstated claims, rethink its dismissal of the state-law claims, we will vacate the dismissal of those claims. But in so doing we emphasize that we do not mean to suggest that if, on remand, the District Court were once again to dismiss the state-law claims, such a renewed dismissal would, ipso facto, constitute, or, in the alternative, not constitute, an abuse of discretion. Remand will simply provide the District Court with an opportunity to exercise its discretion anew. The proper exercise of that discretion is, in the first instance, the responsibility of the District Court, not this court.

## E.   Costs

[19] The District Court awarded costs of $36,430.58 to defendants, finding such an award appropriate because summary judgment was granted to defendants on all claims and

---

[16]28 U.S.C. § 1367(c) provides that:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if- (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

no factual basis for the suit existed. As we have reversed the District Court's determinations with regard to a number of plaintiffs' claims, we will vacate the award of costs.

## V.    Conclusion

In summary, we affirm the District Court's grant of summary judgment to defendants on plaintiffs' equal protection claims regarding access to sewers and the provision of infrastructure. We reverse the District Court's grant of summary judgment on plaintiffs' equal protection claims regarding (1) exclusion from the MTSA and (2) law-enforcement response, and we remand those claims to the District Court. We also reverse the District Court's dismissal of plaintiffs' claims under the FHA regarding the provision of law-enforcement services. The District Court's dismissal of plaintiff's state law claims is vacated; the District Court may exercise its discretion whether to reinstate those claims. The District Court's award of costs to defendants is vacated.

This case is remanded for further proceedings consistent with this opinion.

**Affirmed in part, Reversed in part, Vacated in part, and Remanded.**

Each party shall bear their own costs on appeal.